IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE ERECTION COMPANY, INC., a )
Washington Corporation, )
                                )
            Plaintiff, )
                                )
            v. )        Civil No. 11-805-JE
                                )
W&W STEEL, LLC, a Delaward limited )
liability company, )        OPINION AND ORDER
                                )
              Defendant. )
_____)

Jason W. Alexander
Sussman Shank, LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205
       Attorney for Plaintiff

Eric A. Grasberger
Stephen P. Kelly
Stephen H. Galloway
Stoel Rives, LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204

       Attorneys for Defendant

JELDERKS, Magistrate Judge:

Petitioner, The Erection Company, Inc. (TEC) brings this breach of contract action against respondent W&W Steel, LLC (W&W). Petitioner TEC brings claims seeking to compel arbitration of the parties' dispute, and asserts alternative breach of contract and equitable claims. Pending before the court are TEC's motion to compel arbitration and respondent W&W's motion for summary judgment on TEC's breach of contract claim. For the reasons set out below, TEC's motion to compel arbitration is denied, and W&W's motion for summary judgment is granted.

## Factual Background

This action arises from negotiations between the parties concerning the construction of Intel Corporation's D1X Project (the Project) in Hillsboro, Oregon. Intel hired Hoffman Construction Company of Oregon (Hoffman) as the general contractor for the Project, and Hoffman selected respondent W&W as the steel fabricator and steel erector. TEC provided bids for steel erection work on the Project to several companies, including W&W, that submitted bids to work on the Project. In its bid to Hoffman, W&W included a bid price TEC had submitted for steel erection work on the Project.

On January 6, 2011, Adam Jones, Jr, a TEC Project Manager, provided W&W a 4-page "New Bid Proposal" offering to perform certain steel erection work on the Project for $3,707,000. The proposal specified particular "INCLUSIONS," "EXCLUSIONS," "SPECIAL CONDITIONS," and "PAYMENT" terms.

Hoffman and W&W executed a subcontract that was effective January 7, 2011. That subcontract required W&W to perform its work in accordance with Hoffman's Contract Documents and Project schedule, and agree that its subcontracts with lower-level subcontractors would bind those subcontractors to the terms of W&W's subcontract with Hoffman. This meant that any subcontractor that W&W engaged would have the same obligations to W&W that W&W had to Hoffman.

After W&W was awarded the contract for the Project, TEC personnel accepted an invitation to meet with W&W's home office Project Managers in Oklahoma City to discuss TEC's erection work.  Adam Jones Sr., Adam Jones, Jr., and Lance Richotte of TEC met with W&W's Project Managers on January 11, 2011.  TEC asserts that the requirements set out in the bid proposal it provided to W&W on January 6, 2011, were discussed at the meeting, and that W&W had no objections to those provisions.

Michael Hankins, W&W's Senior Vice President Sales Manager, has submitted a declaration asserting that, during the visit, W&W neither committed to have TEC work on the Project nor authorized TEC to perform any work on the Project.  Nevertheless, a 28 page "abridged project chronology" and other exhibits attached to a declaration of Jones, Sr. reflect significant efforts that TEC invested in Project related work from mid-January through mid-April, 2011.  These materials show that TEC employees, including a full-time project manager, worked on the Project site at times during this period, that TEC and W&W communicated frequently concerning the evolving plans for the Project, and that TEC planned how the structural work on the Project would be carried out and responded to W&W's questions about particular aspects of the steel work.  TEC was provided parking passes and had a trailer on site during much of this time.

On January 28, 2011, Hankins emailed TEC's project manager, Adam Jones, Jr., a letter of intent (LOI).  W&W cites four provisions in the LOI in support of its assertion that TEC was on notice that W&W would not be contractually bound to have TEC perform the steel erection on the Project until both parties had signed a subcontract agreement.  These provisions stated, in relevant part:

> This Letter of Intent is subject to the execution and the terms and conditions of a definitive Subcontract Agreement (as defined below).
>
> 3. Execution of Subcontract Agreement.  Except as otherwise provided in this Letter of Intent, the obligations of the parties are conditioned upon the execution of a formal and definitive subcontract agreement (the "*Subcontract Agreement*").  The Subcontract Agreement shall include, but need not be limited to, the terms of this Letter of Intent

and such other terms and conditions as the parties may mutually agree. The parties shall use good faith efforts to cause the Subcontract Agreement to be mutually executed by the parties on or before thirty (30) days after W&W Steel enters into a definitive agreement with the General Contractor for work on the Project.

5. <u>Contingencies</u>: Any obligations of W&W Steel as may be set forth in this letter are entirely contingent upon ***** (c)W&W and your company entering into a definitive Subcontract Agreement (as defined below) under such terms and conditions as the parties may mutually agree.

14. <u>Binding and Non-Binding Effect</u>. The parties agree that it is their intention that a binding contract and agreement shall exist between them and shall be effective <u>only</u> when the Subcontract Agreement is signed by all parties. [Emphasis in original.] Notwithstanding the foregoing, your company's obligations with respect to Insurance, Indemnification, Confidentiality, Non-Circumvention, and Exclusive Dealings shall be binding. Subject to the foregoing, the legal rights and obligations of the parties hereto will consist only of those, which are set forth in the Subcontract Agreement.

On February 3, 2011, Jones, Jr. sent Hankins an unsigned copy of the LOI which had been amended by cross-outs and written changes. TEC never signed the LOI, and W&W never issued a revised version of the LOI that included TEC's changes..

On March 11, 2011, W&W sent TEC two copies of its standard form subcontract, and asked that they be executed and returned. The letter transmitting the copies of the subcontract stated that, after they were returned, W&W would send TEC a "fully executed" copy for its records. The subcontract stated that it would incorporate the Hoffman Subcontract, which in turn included the Contract Documents. Paragraph 18 of the subcontract stated that any claims arising out of or related to the subcontract were subject to binding arbitration in Oklahoma City, Oklahoma, and would be governed by Oklahoma law.

TEC did not return signed copies of the subcontract it received from W&W. Instead, on March 28, 2011, it returned the subcontract with substantial handwritten changes. These included the addition of a provision stating that "TEC's proposal dated 1/6/11 is made part of this agreement, and overrules any conflicting language or subcontract term. TEC's Scope letter is attached to this subcontract as exhibit 'D'".

W&W accepted some, but not all, of TEC's changes to the subcontract, and did not

accept incorporation of TEC's January 6, 2011 proposal.

Hankins emailed a revised draft of the subcontract to Jones, Sr. on March 29, 2011. On March 30, 2011, Gayl Spilman, TEC's controller, faxed Hankins a revised draft of the subcontract with a number of handwritten changes. Spilman stated that these were items that TEC thought needed to be changed. The draft again inserted the "exhibit 'D'", January 6, 2011 proposal as an attachment, and sought new changes in parts of the subcontract to which TEC had requested no changes in the draft returned to W&W on March 28, 2011. Hankins returned a revised subcontract to TEC that accepted some of the requested changes, and again rejected incorporation of TEC's January 6, 2011 proposal.

On March 30, 2011, Hankins and W&W's General Counsel participated in a conference call with Jones, Sr. Hankins asserts that Jones, Sr. "continued to insist on TEC's requested changes, without compromise," and insisted that W&W "had previously accepted language [that W&W rejected in TEC's] latest revision."

Hankins and Jones, Sr. discussed the subcontract by telephone again on April 4, 2011, and Hankins agreed to prepare and forward a subcontract to TEC reflecting the terms to which they agreed. On April 5, 2011, Hankins emailed Jones, Jr. a revised copy of the subcontract that included some changes discussed during the March 30, 2011 telephone conference, but did not include all of the changes TEC had requested.

On April 5, 2011, Spilman sent Hankins the following email:

> Mike,
>
> Adam has reviewed the changes and finds them to be per your negotiations yesterday with the following exceptions:
>
> 1.item 19 (page 9) Changes were not made . . . see attached changes needed
>
> 2. TEC Exclusions (scope letter dated 1/06/11) Item #1 was not included (copy attached with details)
>
> 3. TEC Exclusions (scope letter dated 01/06/11) Item # 20 was not included (copy attached with details)
>
> 4. TEC Special Conditions (scope letter dated 01/06/11) Item 8,(o) was not included (copy attached with details)

Per Adams [sic] notes all of these were agreed upon.. If you agree please make changes and adds and we will promply sign and return.

In his email response, Hankins stated that he was out of the office but would review the proposed changes "in the morning." He added that "[i]n the interim, we need the notes and the complete report as it pertains to the financials you submitted."

On the morning of April 6, 2011, Hankins emailed Spilman a redlined copy of the subcontract in PDF format, and told her that "[t]he changes that we agreed upon were either already made or I have added the (item No. 1 on list of exclusions)." The draft, which was labeled "FINAL," incorporated some, but not all, of the latest changes TEC had requested. Hankins asserts that the only difference between this version and the "clean version file named REV4 was the addition of Item 4 to the exclusions shown on Attachment "B" to the subcontract." He adds that he was "still waiting for TEC to send the requested financial information."

In an email to Hankins later in the day on April 6, 2011, Spilman proposed changes to Item 4 of the exclusions which she asserted would "make[] it read better and clearly outline[] the intent." Spilman stated that "these changes are for clarification so I will assume that you will not have an issue with them," and added: "Glad to have this behind us . . . . .please send a clean contract and we will get is [sic] signed and get back to you immediately." In his email response, Hankins denied the request to modify the subcontract that had been submitted to TEC. Hankins reminded Spilman that he had "requested the full report and notes from you that the CPA firm submitted to you in preparation of your financials," and asked her about the "status" of those documents.

Later on April 6, 2011, Hankins received the following email from Spilman's email address:

Mike,

We will use your email as clarification of the language in Exclusion #4. It is poorly worded and unclear. Industry standards allow for a percentage of retesting and we will not waive that.

In addition we will not be submitting any further CPA information.
Our bonding rate is 1%.
Adam Jones, Sr.

Hankins replied to the email as follows: "Ok, When can we expect the executed subcontract to be returned?"  Spilman responded a short time later: "Mike, Can you please send me a clean copy and we will sign and return.  Thanks."

TEC asserts that Hankins' "Ok" email confirmed that the parties had reached a "meeting of the minds" as to the subcontract, and that the terms of the subcontract were contractually enforceable.  W&W disagrees, and asserts that the subcontract was only a "proposed TEC subcontract" that included a number of important issues that W&W needed to consider before executing an agreement.  Hankins asserts that, because TEC had a "history of rehashing agreed-upon terms and raising new issues," he needed TEC to "commit to a version of the subcontract" so that he "had something tangible to discuss with Rick Cooper," W&W's President and CEO.  Hankins further asserts that, though he has "authority to sign contracts on behalf of W&W," in practice he did not sign "important contracts" until he had discussed "key contract terms with Mr. Cooper . . . ." He adds that he planned "to take the signed subcontract that TEC submitted and discuss the key terms with Mr. Cooper and determine if we would be willing to sign the subcontract."

On the morning of April 6, 2011, before the last of these email exchanges, Jones, Jr. sent a document marked "Submittal # 4 - Delivery Instructions" to James White, a W&W Senior Project Manager.  That document included terms prescribing how W&W was to mark and deliver the steel components that the erector was to install at the Project. It also stated that TEC would have the "right to deviate from the schedule, as it deems necessary."  White has submitted a declaration stating that, in a meeting at the Project site on April 7, 2011, he and another W&W employee informed Jones, Sr., that W&W would not accept Submittal #4.  White states that Jones, Sr. "did not retract Submittal #4, saying essentially 'you do what you have to do.'"  W&W asserts that, while it was

negotiating the subcontract with Jones, Sr., Jones, Jr. was attempting to add terms by proposing Submittal # 4 to W&W's Project Manager.

W&W never sent TEC a "clean copy" of the "FINAL" draft of the subcontract for execution.  On April 13, 2011, Spilman sent Hankins the following email:

> Mike,
>
> Just checking in with you as I still have not received a clean copy of the contract.  I was under the impression that you were sending it so we can sign and return???
>
> Please let me know.
> Thanks

In a telephone call on April 14, 2011, Rick Cooper, W&W's CEO, informed Jones, Sr. that W&W did not intend to subcontract the erection work on the Project to TEC.  Jones, Sr. responded by asserting that the parties had already agreed to the terms of a subcontract on April 6, 2011.

Cooper replied with the following email:

> Re:     Intel/Hoffman D1X Project, Hillsboro, Oregon
>
> Dear Mr. Jones:
>
> This letter shall serve as notice that W&W Steel LLC ("W&W") has decided not to use The Erection Company Inc. ("TEC") as the erector on the above referenced Project.
>
> W&W asked TEC to provide a quote for the steel erection for this Project in adherence to the Prime Contract and the Subcontract between W&W and Hoffman ("Contract Documents").  TEC was to review the requirements set forth in the Contract Documents and provide a price quote for meeting those requirements.  Instead, TEC provide a price quote but made repeated attempts to modify and take exceptions to the Contract Documents.  Your letter dated January 6, 2011, which you have insisted be made part of the agreement between W&W and TEC, is a four page list of changes under the headings of "Inclusions," "Exclusions", "Special Conditions" and "Payment".  Some of these items are in direct conflict with the Contract Documents.
>
> TEC's attempt to write its own terms and conditions has put W&W in a bad position.  Clearly, there has not been a meeting of the

minds between W&W and TEC.  Because you have been unwilling
to accept the Contract Documents, as written, and have made
repeated attempts to substantially modify the scope of the erection
work on the Project, we are unable to contract with the TEC on
this Project.

Yours very truly

Rick Cooper
Chief Executive Officer
President

In a letter to Cooper dated April 15, 2011, Jones, Sr. asserted that the parties had

reached a "meeting of the minds" which was confirmed by "emails with Mike Hankins

agreeing to the 'FINAL draft' of the contract" on April 6, 2011.  Jones, Sr. asserted that

we have made proprietary changes in the method of construction,
attended meetings, purchased material, hired onsite managers and
safety consultants, priced all changes, submitted all procedures,
completed very detailed schedule engineered erection plans, and
have a jobsite office set up . . . .

He asked Cooper to rescind the letter of April 14, 2011.

In a letter to Cooper dated April 18, 2011, TEC's counsel reiterated TEC's

assertion that W&W's agreement to a final subcontract had been confirmed on April 6,

2011, when Hankins emailed: "Ok, When can we expect the executed subcontract to be

returned."

W&W did not rescind its letter of April 14, 2011, and engaged another steel

erector to carry out the steel erection at the Project.  Hankins asserts that the other

company "was able to get up to speed quickly, accomplishing in a couple of weeks what

TEC was unable to do in months."  He also asserts that this company "signed the

standard W&W subcontract without any modifications and agreed to perform the work

for close to the same price."

**TEC's Claims**

TEC's claims in this action include a "petition to compel arbitration" and an "alternative complaint for contract breach damages and other relief."  In its petition to compel arbitration, TEC asserts that the parties reached an enforceable subcontract agreement on April 6, 2011.  TEC further alleges that, even if the court were to find that the parties did not reach agreement on a "specific final form of written subcontract," the existence of an enforceable subcontract is established by "the objective manifestations of the parties as evidenced in their conduct and words . . . ."

TEC's first claim, brought pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, seeks an order requiring arbitration as set out in Paragraph 18 of the Subcontract.

In its first alternative claim, TEC alleges that the parties "by the objective manifestations of their words and conduct, formed an enforceable contract which contained all essential contract terms which are set forth in the January 6, 2011 TEC Proposal" and that their "words and conduct thereafter, occurring prior to April 14, 2011, established their agreement for TEC's performance of additional and changed work for which TEC is entitled to additional payment beyond that provided for in the TEC proposal."   TEC alleges that W&W breached its duties under the terms of "the accepted TEC Proposal," and is entitled to the damages resulting from that breach.

In its second alternative claim, subtitled "Quantum Meruit/Unjust Enrichment/Retention of Trade Secret and/or Confidential Proprietary Information," TEC alleges that its

> work and contributions to the Project substantially benefited [sic] W&W and the Project.  That benefit included major design-change suggestions by TEC that were incorporated into the Project, as well as other valuable engineering, design, scheduling, trade secret and confidential proprietary information.  Such benefit was provided at the request of and with the knowledge of W&W.   Under the circumstances, it would be unjust to allow retention of that benefit without payment to TEC by W&W of the reasonable value of such benefit.

On this second alternative claim, TEC seeks recovery of "benefits including trade secret and/or other proprietary and valuable information, expertise and value engineering, and in amount to be proven at time of trial, plus interest from the due date at the rate of 9% interest."

## Discussion

### I. Applicable Legal Standards and Principles

### A. Federal Arbitration Act

Section 2 of the Federal Arbitration Act (FAA), 9 U.S.C. §2 , provides that

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Though the FAA requires that provisions to arbitrate be made in writing, agreements to arbitrate may be enforceable "even absent a signature." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 846 (2d Cir. 1987) (citing McAllister Brothers, Inc. v. A & S Transportation Co., 621 F.2d 519, 524 (2d Cir. 1980).

Section 4 of the FAA, 9 U.S.C. § 4 provides, in relevant part, that

> A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court [which has jurisdiction] for an order directing that such arbitration proceed in the manner provided for in such agreement. *****  The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . .If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.  If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue.

Agreements to arbitrate are rigorously enforced, and "any doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration." Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 720 (9th Cir. 1999) (quoting Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983)). However, courts cannot compel the arbitration of issues that parties have not agreed to arbitrate. E.g., AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986).

In determining whether parties have agreed to arbitrate particular disputes, courts apply "ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945 (1995). Relevant state law governs "issues concerning the validity, revocability, and enforceability of contracts generally." Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987).

B. **Contract Formation Under Oregon Law**

TEC cites and relies upon Oregon law in its analysis of the issue of contract formation. W&W also relies on Oregon law, and I will apply this law in analyzing the pending motions.

Oregon applies an "objective" theory of contracts. Ken Hood Construction Co. v. Pacific Coast Construction, Inc., 201 Or. App. 568, 578, 120 P.3d 6 (2005) (citing Kabil Developments Corp. v. Mignot, 279 Or. 151, 156, 566 P.2d 505 (1977)). In analyzing whether a contract exists, and the terms of a contract if one does, Oregon courts "examine the parties' objective manifestations of intent, as evidenced by their communications and acts." Id. (citing Kabil, 279 Or. at 157-58).

The existence of a contract is a question of law. Id. at 577. Manifestation of mutual assent ordinarily occurs through an offer or proposal by one party followed by acceptance of the other party.  Ken Hood Construction, 201 Or. App. At 578 (citing *Restatement (Second) of Contracts § 17(1) (1981))*. A manifestation of acceptance made to an offeror or an offeror's agent results in a contract regardless of the intent of the party that manifests the acceptance. Id. (citing Real Estate Loan Fund of Oregon, Ltd. v.

Hevner, 76 Or. App. 349, 355, 709 P.2d 727 (1985)).  "'Anything that amounts to a manifestation of a formed determination to accept the offer, communicated to the party making such offer,' completes the contract."  Id. at 579 (quoting Gordon v. Curtis Brothers A.D. Moodie House Moving Co., 119 Or. 55, 62-63, 248 P. 158 (1926)). "Mutual assent may be inferred from the conduct of the parties."   Id. (citing VTech Communications, Inc. v. Robert Half, Inc., 190 Or. App. 81, 86, 77 P.3d 1154 (2003). The party asserting the existence of a contract has the burden of establishing its existence and terms.  Bernard v. Vatheuer, 303 Or. 410, 412, 737 P.2d 128 (1987).

II. **Anaysis of TEC's Motion to Compel Arbitration**

A. **Summary Judgment Standards Apply**

The parties agree that, though the motion to compel arbitration is not, strictly speaking, a motion for summary judgment,  the court should apply summary judgment standards in analyzing whether they had reached a binding agreement that included the arbitration clause upon which plaintiff's motion is based.  I agree, and apply the following standards in "summarily" determining, pursuant to Section 4 of the FAA, whether TEC's motion to compel arbitration should be granted:

**STANDARDS FOR EVALUATING MOTIONS FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case.  Id.  When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial.  Id. at 324.

The substantive law governing a claim or defense determines whether a fact is material.  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

(9th Cir. 1987).  Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party.  Id. at 630-31.  The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985).  No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B. **Analysis of Motion to Compel Arbitration**

There is no question that the present dispute concerns an arbitration clause in a written provision of a contract that involves "commerce" within the meaning of the FAA. There is no question that the arbitration provision included in the subcontract applies to the present dispute if, as TEC contends, the parties reached a "meeting of the minds" on April 6, 2011, mutually committing themselves to the terms of that agreement.  In determining whether TEC's motion to compel arbitration should be granted, the question is whether the parties' negotiations resulted in a binding agreement under the terms of the "redlined" subcontract that Hankins sent to TEC on April 6, 2011.

In analyzing this issue, I have carefully reviewed the parties' memoranda, and have thoroughly examined and considered all of the relevant documents and declarations, including Jones, Sr.'s lengthy declarations and voluminous attachments.  A careful review of these materials supports only the conclusion that TEC and W&W expected that TEC would perform the steel erection work on the Project.  However, this review also supports only the conclusion that plaintiff TEC cannot establish that the parties agreed that a binding contract would be formed before both parties had signed a subcontract.

Both parties cite and rely on the Restatement (Second) of Contracts, and place special emphasis on § 27 and related comments and reported decisions analyzing contract formation.  They disagree as to which of the comments to § 27 more accurately describes the circumstances at issue here.

I have carefully reviewed § 27, the comments to that section, and the decisions cited by the parties. In analyzing the parties' contentions, I need not determine which particular comment most closely applies to the circumstances at issue here. Section 27 and the related comments are wholly consistent with the Oregon law of contract formation set out above, and simply "restate," in various contexts, the fundamental principle that formation of a binding agreement depends on the parties' "objective manifestation" of their intent.

In applying that principle of contract formation to the circumstances presented here, the Oregon Supreme Court's decision in <u>General Realty Corp. v. Douglas Lowell, Inc.</u> 223 Or. 244, 354 P.2d 306 (1960), provides the clearest guidance I have found. The <u>Realty Corp.</u> Court emphasized that "'[w]here it is clearly understood that the terms of a proposed contract, though tentatively agreed on, are to be reduced to writing **and signed** before it is complete and binding on the parties, there is no final contract until that is done.'" <u>Id.</u> at 254 [emphasis added] (<u>quoting</u> 12 Am Jur. 522, Contracts § 25).

With this guidance in mind, evaluation of the parties' manifestations of their intent concerning the degree of formality required to create a binding subcontract here must begin with reference to the Letter of Intent (LOI) that W&W sent to TEC on January 28, 2011. In that letter W&W unequivocally "manifested" its intent not to be bound by any draft of a subcontract with TEC until such agreement was signed by <u>both</u> parties. The LOI stated four times that the conclusion of a binding contract depended on the execution of a subcontract, and clearly stated that this "execution" would not be complete until both parties had signed. The first of these assertions stated that the letter of intent was "subject to the execution and terms and conditions of a definitive Subcontract Agreement" as defined in the LOI. The second of these, set out in paragraph 3, stated that the parties' obligations were conditioned on the parties' execution of a "formal and definitive subcontract agreement." The third, set out in paragraph 5, provided that W&W's obligations were "entirely contingent upon" the parties' "entering

into a definitive Subcontract Agreement" as defined later in the LOI.  The definition of a "definitive Subcontract Agreement" is set out in paragraph 14, which explicitly stated W&W's understanding that a "binding contract shall exist . . . and shall be effective <u>only</u> when the Subcontract Agreement is signed by all parties." [Emphasis in original.]

Given W&W's unequivocal manifestation of an intention to be bound only when a formal subcontract had been signed by both parties, the question is whether W&W subsequently manifested an intention to be bound by anything other than a mutually signed agreement.  TEC contends that, in a letter dated March 11, 2011, W&W "revoked, superseded, and negated" any requirement that the parties' agreement be signed by both parties before it was binding.

A careful review of the record supports only the conclusion that neither this letter nor other conduct on W&W's part altered the requirement of full execution set out in the LOI.  As noted above, W&W's March 11, 2011 letter, which accompanied two copies of W&W's standard form subcontract, stated that W&W would send TEC a "fully executed" copy of the subcontract after TEC had returned signed copies.  TEC's execution of those subcontracts may have arguably given rise to a binding agreement even if W&W had not signed, because W&W explicitly stated that it would return a "fully executed" copy if TEC agreed to its standard form agreement.  However, I need not and do not reach that question, because that is not what happened.  Instead of agreeing to W&W's standard subcontract, TEC returned a copy with numerous changes, and included a provision stating that TEC's "proposal" of January 6, 2011, was to be part of the agreement and would "overrule[] any conflicting language or subcontract term." This rejection of W&W's offer terminated TEC's power of acceptance, and a series of exchanges between the parties followed during which numerous provisions were repeatedly revised, and during which W&W continued to assert that it needed more information concerning TEC's "financials."

During these negotiations , W&W did not manifest an intent to conclude a

binding agreement without the signature of both parties as required in the LOI.  Nothing in W&W's conduct following TEC's rejection of the subcontract offered March 11, 2011 manifested an intention that any subsequent agreement would be binding absent the signature of both parties that was so clearly set out in the LOI.  Nothing in W&W's conduct after that date waived the execution requirement or estopped W&W from requiring that a subcontract be mutually executed before it took effect.

TEC contends that Hankins' email to Jones, Sr. on April 6, 2011, in which he wrote "Ok, When can we expect the executed subcontract to be returned?",  committed W&W to execute a subcontract according to the terms of the most recent redlined draft.  I disagree.  In the context of W&W's initial unequivocal assertion that it would not be bound to an agreement until both parties had signed, TEC's rejection of its standard subcontract, and difficult and complicated subsequent negotiations, Hankins' email did not manifest W&W's intention to be bound in the absence of a fully executed subcontract.  In the context of the parties' negotiations, Hankins' "Ok" did not unambiguously state that W&W was prepared to sign a "clean copy" of the redlined subcontract.  The "Ok" could be reasonably interpreted as Hankins' assertion that he understood that TEC was not yet prepared to provide more financial information or alter other terms, and his query concerning when an executed subcontract would be returned could be reasonably interpreted as a simple inquiry as to whether TEC was in fact prepared to execute the agreement.  Though it may have appeared that, in their exchange of drafts of the subcontract, the parties had resolved at least most of their disagreements by that time, it is notable that on the same day, TEC sent W&W "Submittal #4," which was unacceptable to W&W and inconsistent with the assertion that all material terms of a mutually acceptable agreement had been resolved.  In the context of W&W's earlier unambiguous assertion that it would be bound <u>only</u> by a fully executed agreement, and the fluidity of the parties' negotiations, Hankins' "Ok" email will not support the conclusion that the parties ever achieved an enforceable "meeting of the minds."

17 – OPINION AND ORDER

Though TEC contends that W&W could not have reasonably required that it provide additional financial information, it is not for this court to decide whether W&W should have been satisfied with the information it had already received. It was W&W's reputation and economic well being that was at issue in choosing an erector, and W&W had the right to seek whatever assurances of TEC's financial condition that it thought necessary. TEC's presentation of "Submittal #4" on the day that Hankins sent the "Ok" email is inconsistent with the assertion that Hankins' redlined draft of the subcontract included all the material terms of an agreement on which there had been a "meeting of the minds."

The arbitration clause that TEC seeks to enforce was included in the subcontract to which TEC asserts the parties agreed. Because TEC cannot establish that the parties ever agreed to the terms of a subcontract, it cannot establish its right to arbitrate the present dispute. The motion to compel arbitration is therefore denied.

## III. **W&W's Cross Motion for Partial Summary Judgment**

### A. **Propriety of Motion as to Alternative Breach of Contract Claim**

W&W seeks summary judgment on both TEC's claim arbitration claim, which alleges that the parties reached an enforceable subcontract agreement on April 6, 2011, and TEC's alternative breach of contract claim, which alleges that, by their "words and conduct," the parties formed an enforceable contract incorporating the terms of its January 6, 2011 Proposal.

For the reasons discussed above, TEC cannot establish that the parties reached an enforceable agreement on April 6, 2011. In the absence of a record that will support that conclusion, W&W is entitled to summary judgment on TEC's petition to compel arbitration.

TEC acknowledges that W&W may properly seek summary judgment as to the "arbitration" component of this action now, but contends that W&W's motion for partial summary judgment is improper as to alternative breach of contract claim before "required

disclosures" have been made, discovery has been conducted, and the court has decided the motion to compel arbitration.  I disagree.  Federal Rule of Civil Procedure 56(b) allows a party to file a motion for summary judgment at any time until 30 days after the close of all discovery unless the court fixes a different limit.  Here, the pretrial scheduling order allows for the filing of dispositive motions for up to 120 days from July 1, 2011. W&W's motion is allowable under Rule 56(b), and complies with the pretrial schedule entered in this action.  The record before the court includes material that is clearly sufficient to determine whether material issues of fact exist as to TEC's first alternative claim.  Under these circumstances, W&W's motion for summary judgment as to this alternative claim is properly before the court.

B. **Analysis of Alternative Breach of Contract Claim**

TEC's first alternative breach of contract claim  alleges that the parties "by the objective manifestations of their words and conduct, formed an enforceable contract which contained all essential contract terms which are set forth in the January 6, 2011 TEC Proposal" and that the parties' "words and conduct thereafter, occurring prior to April 14, 2011, established their agreement for TEC's performance of additional and changed work for which TEC is entitled to additional payment beyond that provided for in the TEC proposal."

The above discussion of TEC's motion to compel arbitration applies to TEC's alternative breach of contract claim as well.  A careful review of the declarations and exhibits submitted by the parties, including the voluminous material submitted with the declarations of Jones, Sr., supports only the conclusion that TEC cannot prevail on this claim.  As noted above, this material establishes that the parties expected that TEC would be the erector on the Project.  However, that expectation was to be realized only upon the conclusion of a fully executed subcontract agreement.  In the LOI, W&W stated in the clearest of terms its intent to be bound <u>only</u> when a subcontract agreement had been executed by <u>both</u> parties.  Nothing in W&W's conduct after it sent TEC the LOI

manifested an intent to revoke its assertion that TEC would be the erector on the Project only if the parties fully executed a subcontract.  Under these circumstances, W&W is entitled to summary judgment on TEC's alternative breach of contract claim.

**Conclusion**

Plaintiff TEC's motion to compel arbitration without an evidentiary hearing (#8) is DENIED, and defendant W&W's motion for partial summary judgment (#30) is GRANTED.

DATED this 20th day of October, 2011.

 /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge